IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:                                          CASE NO. 14-00478 (ESL)

MATERIAL MANAGEMENT, INC.                       CHAPTER 11

　　　Debtor

OPINION AND ORDER

This case is before the court upon the motion to convert the instant case to Chapter 7 filed by creditors L.A. SCRAP EXPORT, INC. ("LA") and L.A. SCRAP PUERTO RICO ("LAPR") (collectively referred to hereinafter as "Scrap"), and the opposition thereto by the debtor Material Management, Inc. ("Debtor" or "MMI").  The court held an evidentiary hearing on the contested matter on April 15, 2014 and April 28, 2014.  After considering the motions filed by Scrap and the Debtor, the testimony of the witnesses, the documents submitted as exhibits, the argument by counsel and the proposed findings of fact and conclusions of law submitted by the parties, the court concludes that there is cause to convert the instant case to Chapter 7.  Consequently, for the reasons set forth below, the case is hereby converted to Chapter 7.

Findings of Fact

1.  On January 28, 2014 ("Petition Date"), Materials Management, Inc. ("MMI") filed its petition for reorganization under Chapter 11 of the Bankruptcy Code and has been operating its business and managing its affairs as a debtor-in-possession under 11 U.S.C. §§ 1107 and 1108.

2.  Prior to the Petition Date, on or about 2008, LA commenced doing business with Material Management, Inc. by buying scrap metal from the Debtor.

3.  On or about 2009, Debtor invited LA to invest on shredder equipment, where LA would provide the means to acquire said equipment, and the Debtor would provide its expertise for the equipment's assembly.  LA agreed to the arrangement and disbursed to the Debtor and its President, Mr. Roy Barrie ("Barrie"), an initial payment of $500,000 and $250,000 during the

period from November 2011 to June 2012.  The shredder was bought in pieces from different suppliers for the sole purpose to commence the assembly of the same.  The assembly and initial functionality took approximately two years longer than what was originally scheduled.

4.  The shredder is a Super Heavy Duty Dry Shredding System ("SHREDDER") located in the Debtor's facilities at kilometer 26.6 of State Road #2, Espinosa Ward, Dorado, Puerto Rico.

5.  The SHREDDER had not been producing fully since 2012 and is still not functioning properly. Therefore, LA and the Debtor agreed to seek for a joint loan in order to be able to finance the required repairs to the SHREDDER and be able to keep a steady cash flow for the funding of the SHREDDER's operating costs.

6.  The parties submitted a joint loan application to obtain the repair funds to no avail because the Debtor did not qualify to guarantee payment of the loan.  However, LA obtained a loan from Royal Business Bank ("RBB") with the consent of the Debtor.  The Debtor transferred the title of the SHREDDER to LA.  LA's SHREDDER was then given as collateral to RBB for the secured loan.  Mr. Roy Barrie subscribed a *Sworn Statement* on July 7, 2012, executed before Notary Public Carlos A. Santana, affidavit no. 6658.  The purpose of this *Sworn Statement* is to effectively transfer the ownership of the SHREDDER from MMI to LA, who had been responsible for providing the financing for its operation, the heavy material, the parts, and the raw material supply.

7.  The agreement stipulated that the operation was subject to a specific formula to be agreed between parties and that would be based on market conditions.  In addition, the Debtor was bound to be responsible for compliance with all the local required permits for the operation of the SHREDDER and responsible for the operation and management of the equipment.

8.  On July 24, 2012, the parties signed a document titled *Agreement and Covenant regarding Equipment Ownership, Collateral Pledging, Notifications, and Entry onto Premises* (the "*Ownership Agreement*") which was subscribed by LA's President, Mr. Steve Yu, the Debtor's President, Mr. Roy Barrie; Mr. José Cangas Longar ("Landlord"), who is the landlord for the yard where the SHREDDER is located, and a representative of RBB.

-2-

9. Through the Ownership Agreement, the parties consented to the following terms:

a. LA requested a loan from RBB in the amount of $1,000,000.00 to be secured with the SHREDDER as collateral.

b. RBB was willing to make the loan provided that the same was collateralized in part by a senior security interest/lien perfected by a Uniform Commercial Code filing on the SHREDDER.

c. MMI certified ownership of the SHREDDER to LA, stating that "Borrower and MMI represent that the Equipment above-noted is owned by Borrower solely, completely, and without Security or other Interest(s) attached thereto by MMI".

d. The Agreement allows MMI to use the SHREDDER under the terms of a separate contract.

e. Landlord owns the premises where the SHREDDER is located under a lease agreement with Debtor.

10. Through the *Ownership Agreement*, the parties further agreed and consented to the following conditions:

a. MMI will immediately notify RBB upon (i) any late payment and/or default by LA on the terms of its contract with LA (ii) termination of MMI's contract with LA.

b. MMI will grant and in no way inhibit RBB's access to the SHREDDER and to the enforcement of RBB's collateral rights thereto, including, but not limited to, its rights and Landlord's obligations.

c. Landlord (i) disclaimed any current interest in the SHREDDER and affirmed that any potential future interest will be subordinated to RBB, (ii) consents to RBB entering its  premises/property upon reasonable prior written notice to Landlord to protect, take possession, and or conduct a sale of said SHREDDER in the event of default by LA in its obligation to RBB, provided that RBB shall repair any damages to Landlord's property caused by RBB as a result of any such action, and that (iii) Landlord will grant a maximum of 30 days to RBB to take action on the SHREDDER under such circumstances, provided that if RBB elects to enter the leased premises during any period following a default of MMI under the Lease, RBB shall pay Landlord rent for the period RBB remains on the leased premises in accordance with the term of the Lease.

11. On June 13, 2013, LA and Debtor entered a *Company Management and Financing Agreement* (the "*Management Agreement*"), which established the guidelines of the mutual

-3-

obligations between the two entities. Pursuant to the *Management Agreement*, L.A. Scrap Export would have an active participation in the management of daily operations in MMI's business in Dorado, Puerto Rico.

12. MMI accepted in the *Management Agreement* that LA had obtained a loan guaranteed by the shredder and that MMI had not made any of the payments for the amount of $2,220.41 as agreed since August 2012. The Debtor agreed that it owed the amount of $1,279,187.50 as of May 31, 2013 to LA.

13. The Debtor agreed to produce an output requirement of 2,000 metric tons of scrap per month.

14. The Debtor failed to comply with the Agreement between the parties, by refusing to comply with the terms for the management of the business, as established by the parties.

15. On September 30, 2013, the United States Environmental Protection Agency ("EPA") filed a Complaint and issued a Compliance Order against MMI, finding MMI responsible for 5 counts of environmental liability. The Debtor failed to disclose any information about these inspections to LA before signing the Agreement with MMI. The EPA complaint imposes a penalty of $195,180.00 for counts 1 to 5. The administrative process has not been completed.

16. The environmental expert testimony of Mrs. María de los Angeles Negrón ("María Negrón"), who participated of an inspection of the yard and saw the facilities where the Debtor operates, determined the presence of contamination. A Report related to the site inspection dated April 15, 2014 prepared by Mrs. María Negrón was admitted into evidence as **Exhibit C-13**.

17. María Negrón stated that during the inspection she observed the following hazardous conditions:

 a. Numerous vehicle tires and rims of tires mixed together in a mountain of garbage, which constitutes a hazard when they decompose and release toxins such as benzene and others as hazardous waste, in direct violation of the permits.

 b. Liquid petroleum gas tanks ("LPG") and oxygen tanks sparingly visible throughout the yard which shall be stored individually because if exposed to prolonged heat they can

-4-

cause explosions. This is a violation of the permits.

c. Electronic equipment and appliances like refrigerators are seen all throughout the yard, including circuit boards, which are classified as hazardous because they release lead and mercury. The lead and mercury are released from the board and gain direct access to the soil contaminating it in an instant. This is also a violation of the permits.

d. Containers and drums either empty or with lubricants inside and others without the appropriate lid. The containers were neither labeled nor properly stored. The containers and drums were all over the yard, spreading throughout the facility without any control of storage or management. When it rains, water gains access to those containers without a lid, which toxins gain direct access to the soil, thereby contaminating it. The containers did not have labels in order to identify their use and expose if they were new oil a mixture of lubricants and oils, or which chemicals it stored. This is also a direct violation of the permits.

e. A machine apparently used in the operations, which is composed of an upper part and a picker to lift cars. The picker is placed directly in the soil; this is not permitted because no equipment should be placed directly in the soil as they would release oil. The picker is dripping oil directly into the soil. This is also a violation of the permits.

f. Oil stains are sporadically spread directly in the soil, all throughout the scrap yard. The expert noted that the soil was dry because it was a sunny day and stains were apparent and noticeable. This is also a patent violation of the permits and environmental laws.

g. In the facility, there is a channel/canal of water mixed with oil which was completely exposed. When it rains, the mix of oils goes directly into the soil, contaminating it. This is also a violation of the permits.

h. A sinkhole, or a "sumidero", which has an underground water flow that connects directly with the "Zona Cársica" and to the wells of the "Autoridad de Acueductos y Alcantarillados" can be identified at the end of the property where the water collected all throughout the yard meets. Thereby, contaminating the sink hole as stated by the EPA Complaint.

18. María Negrón stated that she had visited more than 60 scrap yards and that she had never seen an environmental violation such as the one in MMI's scrap yard. Mrs. Negrón stated that the area is very sensitive and protected by federal and state governments and that MMI disregards the permits it holds.

19. The Debtor's Operations Manager, Mr. José Miguel Guzmán, testified that the utilities were not paid in the month of March, and that if included they would be operating in the negative, as per the Operating Report filed by Debtor on April 22, 2014.

20. Mr. José Miguel Guzmán recognized that there is a discrepancy between the total cash disbursements for the current month, which total $149,718.78, and the check register for the operating account, which totals $155,990.42. Mr. Guzmán could not identify a reason for the difference in these amounts.

21. The Debtor's Operations Manager recognized that the utilities were not included in the total cash disbursements for the current month nor does the Debtor include a portion for waste disposal.

22. Mr. Roy Barrie admitted through his testimony, as per the Operating Report for the month of March, that if waste disposal costs were included, and if the disbursements were calculated in the Operating Reports as it should have had, the Debtor was in fact operating under a negative balance.

23. Mr. José Miguel Guzmán stated that MMI is currently working mostly with one supplier, which is Zach Recycling, with which the Debtor has no valid contract.

24. The Debtor has not yet filed its Disclosure Statement and Plan.

## Applicable Law

Section 1112(b) of the Bankruptcy Code mandates the bankruptcy court, after notice and a hearing, to convert or dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate, if the movant establishes cause and the case is devoid of unusual circumstances pursuant to 11 U.S.C. §1112(b)(2). See 11 U.S.C. §1112(b)(1). Section 1112(b)(4) of the Bankruptcy Code fails to define what the term "cause" means but provides a list of circumstances that constitute "cause" for conversion or dismissal. This list of causes is nonexhaustive, and therefore a case may be converted or dismissed for other causes. See AmeriCERT, Inc. v. Straight Through Processing, Inc. (In re AmeriCERT, Inc.), 360 B.R. 398, 401 (Bankr. D. N.H. 2007).

The initial burden is on the movant to argue and present evidence by a preponderance of the evidence standard to prove its position that there is cause for either conversion or dismissal of the Chapter 11 case, whichever is in the best interests of creditors and the estate. See Alan N.

Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.04[4] (16th ed. 2013). "Thus, until the movant carries the burden, the statutory direction that the court 'shall convert the case to a case under chapter 7 or dismiss the case' is not operative." Id. The court, after finding cause, has broad discretion to determine whether conversion or dismissal is in the best interest of creditors and the estate. See Gilroy v. Ameriquest Mortg. Co. (In re Gilroy), 2008 Bankr. Lexis 3968 (B.A.P. 1st Cir. 2008); 2008 WL 4531982. However, if the movant proves that there is cause for dismissal pursuant to 11 U.S.C. §1112(b)(4) by the preponderance of the evidence standard, the court must find that movant has established cause. See Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.04[4] (16th ed. 2012).

Once "cause" has been established, the burden shifts to the debtor to identify unusual circumstances that evince that conversion or dismissal is not in the best interest of creditors and the estate. Even if there are no unusual circumstances, the court may not convert or dismiss a case if the debtor establishes and the court finds that: "(1) there is a reasonable likelihood that a plan will be confirmed within a reasonable time; (2) the 'cause' for dismissal or conversion is something other than a continuing loss or diminution of the estate coupled with a lack of reasonable likelihood of rehabilitation; and (3) there is a reasonable justification or excuse for a debtor's act or omission and the act or omission will be cured within a reasonable time." In re Orbit Peroleum, Inc. 395 B.R. 145, 148 (Bankr. D. N.M. 2008).

After the moving party establishes cause to dismiss or convert the case to Chapter 7 and that there are no "unusual circumstances", the court must choose between dismissal or conversion, "whichever is in the best interest of creditors and the estate." 11 U.S.C. § 1112(b)(1). Generally, the standard for choosing between conversion or dismissal based on "the best interest of creditors and the estate" implies the application of a balancing test by the bankruptcy court. See In re De Jounghe, 334 B.R. at 770; In re Staff Inv. Co., 146 B.R. 256, 260 (Bankr. E.D. Cal. 1992). The legislative history shows that Congress intended to invest the bankruptcy court with "wide discretion … to make an appropriate disposition of the case" and "to consider other factors as they arise, and use its equitable powers to reach an appropriate

result in individual cases." In re De Jounghe, 334 B.R. at 770, citing H.R. Rep. No. 595, 95th Cong., 2d Sess. 406, reprinted in 1978 U.S.C.C.A.N. 5963, 6361-62.

Discussion

*(A)     Substantial diminution of the Estate and absence of reasonable likelihood of rehabilitation.*

Scrap requests the dismissal of the this case under 11 U.S.C. § 1112(b)(4)(A). Section 1112(b)(4)(A) provides that cause includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). See In re DCNC N.C. I, LLC, 407 B.R. 651, 664 (Bankr. E.D. Pa. 2009). This particular "cause" consists of two (2) requirements which must be satisfied. "First, it tests whether, after the commencement of the case, the debtor has suffered or continued to experience a negative cash flow, or, alternatively declining asset values. Second, it tests whether there is any reasonable likelihood that the debtor, or some other party, will be able to stem the debtor's losses and place the debtor's enterprise back on a solid financial footing within a reasonable amount of time." Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.04[6][a] (16th ed. 2013).

The court finds that the first prong under Section 1112(b)(4)(A) has been satisfied, as the Debtor is unable to pay for the operational expenses due to reduced income and lack of financing. The second prong under Section 1112(b)(4) is whether the debtor has a reasonable likelihood of rehabilitation. Rehabilitation has been defined as whether the debtor will be able to reestablish its business. "[T]he standard under section 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort. Rehabilitation is not another word for reorganization. Rehabilitation means to reestablish a business. Whereas, confirmation of a plan could include a liquidation plan, rehabilitation does not include liquidation." Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.04[6][a][ii] (16th ed. 2013). "Instead, rehabilitation signifies something more, with it being described as 'to put back in good

-8-

condition; re-establish on a firm, sound basis.'" In re Creekside Senior Apts., L.P., 489 B.R. 51, 61 (B.A.P. 6th Cir. 2013), citing In re Westgate Props., Ltd., 432 B.R. 720, 723 (Bankr. N.D. Ohio 2010) (quoting In re V. Cos., 274 B.R. 721, 725 (Bankr. N.D. Ohio 2002)). "Rehabilitation is the restoration of a business' vitality and depends on whether the debtor can formulate within a reasonable amount of time a reasonably detailed business plan." In re 221-06 Merrick Blvd. Assocs. LLC, 2010 Bankr. Lexis 4431, *5 (Bankr. E.D.N.Y. 2010). The purpose of Section 1112(b)(1) is to "preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." Loop Corp. v. United States Tr., 379 F. 3d 511, 516 (8th Cir. 2004), citing In re Lizeric Realty Corp., 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995).

The monthly operating reports show that the Debtor is in reality operating in a negative balance. The Debtor has omitted operating costs, such as waste disposal, unexpected repairs or permits. If included, these costs would place the Debtor's operation further in a negative balance. The Debtor's estate has been diminishing substantially over the years and has continued diminishing since the Petition Date.

It is unlikely that the Debtor will be able to generate sufficient cash flow to service its debts. "A debtor who is unable to service its debt at the outset of the case and remains unable to do so for the foreseeable future does not have a reasonable likelihood of rehabilitation." See In re Creekside Senior Apts., L.P., 489 B.R at 62 (quoting In re Fall, 405 B.R. 863, 869 (Bankr. N.D. Ohio 2009)).

The Debtor's lack of payments for waste disposal is causing a hardship to the environment. The scrap yard has turned into a landfill and the estate needs to cover and address palpable and identifiable environmental and safety concerns in an operation that cannot sustain such expense.

The Debtor admits that they are operating in a negative balance and that they have one single supplier/buyer who is conducting business with no valid contract. The fact that the Debtor cannot sustain a viable operation is sufficient evidence that the assets of the estate keep

diminishing on a monthly basis and that there is a patent absence of a reasonable likelihood of rehabilitation.

*(B)*     *Conversion or Dismissal?*

Courts have generally considered several factors in order to determine whether dismissal or conversion is in the best interest of the creditors and the estate:

> (1) whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal, (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted, (3) whether the debtor would simply file a further case upon dismissal, (4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors, (5) in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise, (6) whether any remaining issues would be better resolved outside the bankruptcy forum, (7) whether the estate consists of a "single asset", (8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests, (9) whether a plan has been confirmed and whether any property remains in the estate to be administered, and (10), whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns. Collier on Bankruptcy, *supra*, at ¶ 1112.04[7].

In this case, a prompt conversion to Chapter 7 would serve the best interest of the creditors because, upon the Debtor's schedules, the assets and liabilities yield a liquidation value of $1,565,070.40.   The Debtor's assets are mostly in machinery that can be orderly liquidated by a Chapter 7 trustee for the benefit of the unsecured creditors in this case.

The Debtor did not present evidence to warrant a finding that there are "unusual circumstances" in this case that evince that conversion or dismissal is not in the best interest of creditors and the estate.   Thus, the court finds that there is cause for conversion of the Chapter 11 case to Chapter 7 under 11 U.S.C. §1112(b)(4)(A).

Conclusion

In view of the foregoing, the motion requesting conversion to Chapter 7 filed by Scrap is hereby granted.   The case is hereby converted to chapter 7.

-10-

SO ORDERED.

In San Juan, Puerto Rico, this 28th day of May, 2014.

Enrique S. Lamoutte
United States Bankruptcy Judge